# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

DAMIAN FRANCOIS                                    CIVIL ACTION

VERSUS

OUR LADY OF THE LAKE                               17-393-SDD-SDJ
FOUNDATION

## <u>RULING</u>

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by

Defendant, Our Lady of the Lake Hospital, Inc. ("OLOL"). Plaintiff, Damian Francois

("Plaintiff") has filed an *Opposition*[2] to this motion, to which OLOL filed a *Reply*.[3]  For the

following reasons, OLOL's motion will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a deaf individual who communicates in American Sign Language

("ASL").[4]  Plaintiff was admitted to OLOL on April 11, 2017 after being shot in the back by

his uncle.[5] Plaintiff contends he experienced extensive discrimination at OLOL, including

the refusal by OLOL provide him with a qualified sign language interpreter. According to

Plaintiff, the most significant instance of discrimination was from April 11, 2017 through

April 16, 2017, when Plaintiff claims OLOL staff attempted to communicate with him solely

---

[1] Rec. Doc. No. 118.
[2] Rec. Doc. No. 134.
[3] Rec. Doc. No. 144.
[4] Rec. Doc. No. 20, ¶¶ 9-10.
[5] Rec. Doc. No. 134-7, Francois Depo. at 27:2-14.

through lip reading and passing notes, which was significant because it was immediately after Plaintiff had undergone a surgery following his gunshot injury. Due to the alleged lack of equal opportunity to communicate, Plaintiff claims he could not understand his condition, treatment options, prescribed medications, or ultimate prognosis.

OLOL denies that it discriminated in any way against Plaintiff and claims that, at all times, the services provided by OLOL complied with the law.  OLOL maintains that its staff believed that Plaintiff understood the methods of communications utilized between April 11 and April 16, 2017, and, as soon as staff was made aware that Plaintiff was not understanding and required an ASL interpreter, one was provided to Plaintiff for the remainder of his lengthy hospitalization.

Plaintiff filed this lawsuit[6] alleging that OLOL violated his rights under Section 504 of the Rehabilitation Act of 1973 ("RA")[7] and Section 1557 of the Patient Protection and Affordable Care Act ("ACA").[8]  Plaintiff seeks damages, injunctive and declaratory relief, and attorneys' fees and costs.  OLOL now moves for summary judgment on all Plaintiff's claims.

## II.    APPLICABLE LAW

### A.    Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] The party moving for summary judgment is initially responsible for

---

[6] Plaintiff asserted claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181, and the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231, but these claims have been previously dismissed.
[7] 29 U.S.C. § 794.
[8] 42 USC § 18116.
[9] Fed. R. Civ. P. 56.

identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[10]  A court must deny the motion for summary judgment if the movant fails to meet this burden.[11]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[12] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[13] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[14]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[15] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[16]  Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[17]

### B.    Compensatory Damages Unavailable

Following the Fifth Circuit's decision in *Jane Cummings v. Premier Rehab Keller, P.L.L.C.*,[18]  wherein the court held that emotional distress damages were not available under ADA and RA,[19] this Court recently granted partial summary judgment on claims for

---

[10] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[11] *Id.*
[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[13] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).
[14] *Anderson*, 477 U.S. at 249 (citations omitted).
[15] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[16] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[17] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[18] 948 F.3d 673 (5th Cir. 2020).
[19] *Id.* at 680.

emotional distress damages in *King v. Our Lady of the Lake Hospital, Inc.*[20] and *Labouliere v. Our Lady of the Lake Foundation.*[21]  However, the Court denied summary judgment, in part, finding that those plaintiffs could recover nominal damages if they proved intentional discrimination on the part of the defendant.  Thus, following *Cummings*, Plaintiff is not entitled to recover any damages other than nominal damages if he carries his burden of proving intentional discrimination.

### C.    Intentional Discrimination

1. <u>Standard for Intentional Discrimination</u>

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[22]  Regulations promulgated by the Department of Health and Human Services offer additional guidance regarding the statute's prohibition in this context. First, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care."[23] Second, "[a] recipient ... that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."[24]  These "auxiliary aids may include brailed and taped material, interpreters,

---

[20] 455 F. Supp. 3d 249 (M.D. La. 2020).
[21] 2020 WL 1435156 (M.D. La. Mar. 23, 2020).
[22] 29 U.S.C. § 794(a).
[23] 45 C.F.R. § 84.52(c).
[24] 45 C.F.R. § 84.52(d)(1).

and other aids for persons with impaired hearing or vision."[25] "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."[26]

In *Miraglia v. Board of Supervisors of Louisiana State Museum*, the Fifth Circuit recently addressed the intent requirement in disability discrimination cases, noting that, "[t]hough intent is a necessary element of a damages claim, we have previously declined to adopt a specific standard of intent."[27] Deciding that it "need not delineate the precise contours in this case," the court referred to its past requirements that a plaintiff prove **something more than deliberate indifference to show intent**.[28]

In *Rosario v. St. Tammany Parish Hospital Service District No. 1*,[29] the Eastern District of Louisiana discussed the Fifth Circuit's guidance for what might constitute intent in these types of cases:[30]

> The Fifth Circuit has repeatedly declined to adopt a specific standard of intent for these statutes. *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018); *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015). But the Fifth Circuit has nonetheless offered some guidelines for what may constitute intent. In *Perez*, the Fifth Circuit noted that intent implies **purposeful**

---

[25] 45 C.F.R. § 84.52(d)(3).
[26] 45 C.F.R. § 84.4(b)(2).
[27] 901 F.3d 565, 574 (5th Cir. 2018)(citing *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015) (per curiam) (stating that "[w]e did not define what we meant by intent in *Delano–Pyle*"); *see also Frame*, 657 F.3d at 231 n.71 (expressing no opinion on whether failure to make reasonable accommodations constitutes intentional discrimination).
[28] *Id.* at 575 (emphasis added).
[29] 2019 WL 1766983 at *7 (E.D. La. Apr. 22, 2019)(citing *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." (citing *McCullum*, 768 F.3d at 1147))).
[30] *Id.* (citing *McCullum v. Orlando Reg'l. Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014)).

**action**. 624 F. App'x at 184 ("We conclude that on the present record, there is enough to show a dispute of material fact on whether [defendant] intentionally, i.e., purposefully, discriminated."). In *Miraglia*, the court explained that intent "requires that the defendant at least have **actual notice of a violation**." 901 F.3d at 575. That is, the defendant must have some notice that its actions have caused the plaintiff to experience unlawful discrimination. *Id.* (reversing district court and rendering judgment for defendant when district court failed to make any findings that the defendant had actual notice of a violation). In *Miraglia*, the court also noted that previous Fifth Circuit opinions "seem to have required that a plaintiff prove ... **something more than 'deliberate indifference'** to show intent." 901 F.3d at 575; *see also Delano-Pyle*, 302 F.3d at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA."). Many other circuits use the deliberate indifference standard. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013) (collecting citations from other circuits that have adopted the deliberate indifference standard). Deliberate indifference requires a showing that "the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (internal quotation marks omitted) (emphasis in original). There must also be some evidence that the defendant made a **"deliberate choice"** not to alleviate the likely harm. *Id.* at 1147-48.[31]

In *Liese v. Indian River County Hospital District*, the Eleventh Circuit noted that "the task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive."[32] However, the *Liese* court clarified:

> Nonetheless, **this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability under the RA. Thus, for example, as both parties agree, the simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA.** Indeed, construing the regulations in this manner would effectively substitute

---

[31] *Id.* at *6 (emphasis added).

[32] 701 F.3d 334, 342 (11th Cir. 2012)(*see e.g.*, *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir.2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir.1999) (finding that whether a sign language interpreter was required under the RA is a question of fact inappropriate for summary judgment); *Duffy v. Riveland*, 98 F.3d 447, 454–56 (9th Cir.1996)(concluding that whether qualified sign language interpreter was required under the Americans with Disabilities Act of 1990 is a question of fact inappropriate for summary judgment).

"demanded" auxiliary aid for "necessary" auxiliary aid. Instead, the proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment.[33]

The court explained that:

> **Whether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment largely depends on context, including, principally, the nature, significance, and complexity of the treatment.** For example, emergency surgery is often a complicated concept to convey to a person who can hear well; the attendant risks, manner of surgery, prognosis, and advantages or disadvantages of immediate or postponed surgery can only complicate this communicative task. Thus, under circumstances in which a patient must decide whether to undergo immediate surgery involving the removal of an organ under a general anesthetic, understanding the necessity, risks, and procedures surrounding the surgery is paramount. Under these circumstances, auxiliary aids limited to written notes, body gestures, and lipreading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment.[34]

By this rationale the medical circumstances are an important consideration in determining the nature and type of accommodation.

   With this guidance in mind, the Court turns to the summary judgment evidence submitted in this matter.

## III.    SUMMARY JUDGMENT ARGUMENTS AND EVIDENCE

   OLOL submits that the question on summary judgment is not whether Plaintiff actually understood or communicated effectively during the course of his care and treatment from April 11th to April 16th, 2017 but rather, the question is whether there is summary judgment evidence that OLOL staff actually knew[35] he did not understand and

---

[33] *Id.* at 343 (emphasis added).
[34] *Id.* (emphasis added).
[35] In *Miraglia*, the court explained that intent "requires that the defendant at least have actual notice of a violation." 901 F.3d at 575.

showed deliberate indifference to this actual knowledge by failing to facilitate effective forms of communication.

When Plaintiff arrived at the OLOL emergency room, he claims his grandmother, Leona Deemer ("Deemer"), advised several OLOL staff members that Plaintiff was deaf and needed an interpreter.[36]  Deemer testified that she informed OLOL nursing staff that Plaintiff could not understand many words written in English and would be unable to understand some words at all.[37]

OLOL contends the morning after Plaintiff's emergency admission, a hospital Care Coordinator, John Deshotel ("Deshotel"), met with him in the hospital's surgical trauma unit.[38]  Deshotel recounts that Plaintiff's grandmother was present during this meeting.[39] In this meeting, Deshotel communicated with Plaintiff using ASL, which is Deshotel's second language.[40]  As he signed, Deshotel also verbally spoke the words he was signing through ASL to Plaintiff.[41]  Deshotel attested that, during this meeting, he had no difficulty communicating effectively with Plaintiff; he was able to clearly understand the information Plaintiff conveyed to him; and Plaintiff responded appropriately to Deshotel's communications, indicating that Plaintiff understood the conversation.[42]

By declaration, Deshotel testified that, during this meeting, Deshotel introduced himself to Plaintiff, explained that his name was John, and that he was the only "John" on the unit, and explained to Plaintiff and Deemer that his role as a Care Coordinator was to

---

[36] Deemer Depo. at 52:17-53:7; 54:5-18; 64:14-23.
[37] *Id.* at 51:4-12.
[38] Rec. Doc. No. 118-3, Deshotel Decl., ¶ 5.
[39] *Id.*
[40] *Id.* at ¶¶ 4, 6.
[41] *Id.* at ¶ 6.
[42] *Id.* at ¶ 7.

ensure that Plaintiff knew that the hospital wanted to meet his needs throughout his admission at the hospital and up to discharge.[43] Deshotel verified demographic information with Plaintiff, discussed the Victims of Crime Program available at the hospital, and requested permission to submit his name to the program, among other things.[44]

Notably, Deshotel testified that he asked Plaintiff if he needed any additional services, and Plaintiff responded that he did not. Deshotel further explained to Plaintiff that, should additional services be required, Plaintiff could ask for Deshotel, and he would come meet with Plaintiff.[45] Deshotel testified that neither Plaintiff nor his grandmother requested a live interpreter at the conclusion of this meeting.[46] Further, Deshotel testified that, at no time during this meeting, did Plaintiff or his grandmother advise that Plaintiff was having difficulty communicating with or understanding hospital staff.[47]

Nurse Allison Berry ("Berry"), who was assigned to Plaintiff on April 12, 2017, testified that she introduced herself to Plaintiff using a whiteboard and that, in response to her communications, Plaintiff "shook his head as if he understood the writing on the board."[48] When Berry explained to Plaintiff, using the white board, that she was going to administering a shot "in [his] belly … to prevent blood clots," Plaintiff "showed understanding for what was about to happen. He even grabbed his gown to pull it up so that I could give the injection."[49]

---

[43] *Id.* at ¶¶ 8-9.
[44] *Id.* at ¶ 9.
[45] *Id.* at ¶ 10.
[46] *Id.* at ¶¶ 11, 13.
[47] *Id.* at ¶¶ 12, 14.
[48] Rec. Doc. No. 118-4, Berry Depo., pp. 12:23–13:3-7.
[49] *Id.* at 15:6–22.

Nurse Katelyn Ferachi ("Ferachi") was assigned to Plaintiff on April 15, and she testified that she also used a whiteboard to communicate with Plaintiff, explaining to him the assessment she was going to perform.[50]   In response, Plaintiff "nodded that he understood."[51] Ferachi further testified that the nurses continued to use a whiteboard with Plaintiff, and "he never gave any indication that he did not understand or that that was not appropriate for him."[52] Ferachi explained that, when hospital staff used the whiteboard to communicate with Plaintiff, "he did answer with either nonverbal cue or a written answer on the board."[53]

OLOL records indicate that, on April 15, Nurse Ashley Welsh noted the following:

Patient's visitor asked to speak to with me at 1530 this afternoon. She stated that the iPad ASL interpreter app was not effective for the patient and that he needs a person in the room to interpret when the doctors come to speak with him. This was the first time I got this request and the patient's nurse Katelyn O' Connor states that it was the first time she got the request as well. As soon as I left the patient's room I called the house managers to request an interpreter. House manager Sonya spoke with Melodie Sparks from Deaf Focus and set up an ASL interpreter to be in the patient's room 9am-11am tomorrow 4/16.[54]

OLOL argues that the Plaintiff's request for additional services was quickly accommodated, and OLOL offers evidence that, for the duration of the Plaintiff's in-patient care, some twenty-nine (29) days, an interpreter was provided to him on sixty-one (61) separate occasions.[55]   Plaintiff was discharged from OLOL on May 18, 2017.[56]

---

[50] Rec. Doc. No. 118-5, Ferachi Depo., 9:24—10:4.
[51] *Id.* at 10:7–8.
[52] *Id.* at 23:4–8.
[53] *Id.* at 28:20–23.
[54] (SEALED) Rec. Doc. No. 11-6, p. 4.
[55] Rec. Doc. No. 118-7, Witter-Merithew Depo., 69:11-21.
[56] (SEALED) Rec. Doc. No. 11-6, pp. 5-6.
Document Number: 60914                                                                                    10

While Plaintiff acknowledges meeting with Deshotel, Plaintiff claims Deshotel has no knowledge of Plaintiff's interactions with any other OLOL staff because he only "briefly" met with Plaintiff on April 12 and 17, 2017.[57]  During the April 12 meeting, Plaintiff claims Deshotel did not offer him an interpreter, did not offer Plaintiff any auxiliary aids, and he did not assess or document Plaintiff's communication needs.[58]  Plaintiff had no further interactions with Deshotel until April 17, 2017.[59]

Plaintiff testified that he was unable to write notes back to OLOL staff.[60]  On April 14, Paula Rodriguez ("Rodriguez"), a friend and advocate for Plaintiff, texted Alice Battista, then-Civil Rights Coordinator at OLOL, advising that Plaintiff needed an interpreter.[61] Plaintiff also maintains his medical records demonstrate a wealth of notes that communication with Plaintiff was limited.[62]

Plaintiff claims, despite his lack of understanding, OLOL staff continued to rely only on notes written on a white board and a picture board to communicate with him.[63]  Plaintiff testified that he could not understand many of the notes written to him by OLOL staff because the messages were too complicated.[64]  Deemer, Plaintiff's grandmother, says that she observed several occasions when Plaintiff would "draw up his shoulder or flop

---

[57] Plaintiff cites Rec. Doc. No. 118-6 at ¶ 5; however, this document is not the Deshotel Declaration but Plaintiff's medical records.  To the extent Plaintiff intends to cite ¶ 5 of Deshotel's Declaration, the Court notes that this citation does not fully support Plaintiff's proffered statement of fact:  "On the morning of April 12, 2017, I met with Damion Francois while he was a patient at the hospital in its surgical trauma unit.  Fr. Francois is deaf.  Fr. Francois' grandmother was present in the patient's room during this meeting."
[58] Rec. Doc. No. 118-6; Rec. Doc. No. 138, p. 40.
[59] Plaintiff cites Rec. Doc. No. 138 (SEALED) at pp. 40 & 66; however, this exhibit does not contain a page 66, and the record of Dehotel's contact with Plaintiff appears on page 62.
[60] Francois Depo. 48:2-8.
[61] Rec. Doc. No. 134-10, Rodriguez Depo. 52:19-53:2.
[62] Rec. Doc. No. 138, pp. 40, 66.
[63] Francois Depo. 48:2-25.
[64] *Id.* at 47:3-23.

his hands" to indicate that he didn't understand a note written by a nurse.[65]

Plaintiff contends that OLOL staff confirms his lack of understanding. Nurse Berry did not recall Plaintiff writing anything to her in English.[66] Nurse Ferachi only recalled Plaintiff writing the word "yes" in response to one of her notes.[67] Plaintiff's friend-advocate, Rodriguez, testified that on April 15, 2017, Plaintiff did not understand that he was paralyzed or what that meant, because he still believed he would have surgery to remove the bullet, and he would be able to walk again thereafter.[68]  Plaintiff cites several pages of his OLOL medical record, wherein OLOL staff members document that Plaintiff was not able to communicate his medical history to OLOL medical staff and that communication with him was "limited."[69]  Indeed, Plaintiff's medical records contain a note that he is unable to read.[70]

The record demonstrates that Plaintiff's physical therapy evaluation was completed with the use of a whiteboard, and his occupational therapy evaluation was completed with the use of a whitesboard and reliance on a friend to interpret.[71]  Plaintiff admits that, by April 14, 2017, his condition was stable, and he was waiting in the trauma unit until he could be transferred into the rehab unit.[72]  Rodriguez also testified that Plaintiff was forced to play "catch up" about his medical condition and prognosis because of the information he missed out on during the first five days after he was paralyzed.[73]

---

[65] Deemer Depo. 79:10-21; 77:6-15.
[66] Berry Depo. 15:11-25.
[67] Ferachi Depo. 9:22-10:8.
[68] Rodriguez Depo. 72:23-73:1-6.
[69] Rec. Doc. No. 138 (SEALED), pp. 17, 21, 25, 42, 50, 54, 59, 62.
[70] *Id.* at p. 4.
[71] *Id.* at pp. 52-56.
[72] *Id.* at 51; Ferachi Depo. at 11:5-16;
[73] Rodriguez Depo. 72:15-22.

Plaintiff also points to the notes of Dr. Malia Eischen from her meeting with Plaintiff and his family on April 16, 2017, wherein Dr. Eischen expresses:

> Patient's family and caregivers expressed concern that the patient was not understanding communication that had previously been provided. He was unclear about his diagnosis as well as his prognosis. He states that the interpreter television provided on the unit is extremely difficult to understand and he was unclear as to what was happening regarding his care.[74]

Thus, Plaintiff contends the only method of communication he was afforded to learn that he was paralyzed and would never walk again prior to April 16, 2017 was through notes written on a white board.[75]  Without an interpreter, Plaintiff claims he experienced pain and suffering because he was unable to effectively communicate his pain levels or understand why he was unable to urinate, and he did not understand the medical procedure of inserting a catheter into his penis, causing him pain.[76]  Further, Rodriguez claims she witnessed a nurse walk into Plaintiff's room and administer a shot into his stomach without any explanation or warning, causing Plaintiff obvious pain and trauma.[77]

Plaintiff notes that OLOL's Statement of Patient Rights establishes that patients have a right to "[b]e informed of your health status and be involved in choices that affect you" and "[b]e informed about the results of care, treatment and services so you can participate in current and future healthcare choices."[78] Through its Statement of Patient Rights, OLOL acknowledges that patients have a right to communicate about their medical conditions and make decisions about their healthcare.[79] Yet, Plaintiff was unable

---

[74] Rec. Doc. No. 138 at p. 62.
[75] *Id.* at 109:21-110:12.
[76] Rec. Doc. No. 134-4, Francois Declaration ¶ 8.
[77] Rodriguez dep. 87:5-24.
[78] *See* https://ololrmc.com/patients-and-visitors/for-patients/patient-rights (last visited April 8, 2020).
[79] *Id.*

to understand his diagnosis and prognosis until he was provided with an interpreter on April 16, 2017, five days after he was admitted to OLOL.[80]   Because Plaintiff was not provided with accommodations that allowed him to effectively communicate with his healthcare providers, Plaintiff claims OLOL failed to provide him the same patient rights afforded to hearing patients solely on the basis of his disability.[81]

Plaintiff feels presently deterred from returning to OLOL hospital because he "felt like the nurses and doctors at OLOL did not respect [his] desire for an interpreter."[82] Now, Plaintiff is scared that if he returned to OLOL, his need for an in-person interpreter or VRI would again not be respected.[83]

Plaintiff likens the facts of this case to those in *Perez v. Doctor's Hosp. at Renaissance, Ltd.*[84] and *Delano–Pyle v. Victoria Cty., Tex.*[85]  In *Perez*, the plaintiffs were the parents of an infant who was diagnosed with a brain tumor, which required numerous hospital visits over a four-and-a-half-year period.[86]   The plaintiffs were both deaf individuals who relied on ASL to communicate.[87]   At summary judgment, they presented evidence that the defendant hospital "repeatedly failed to provide them an interpreter" on 18 occasions over this period.[88] One plaintiff testified that sometimes the "nurses would say no" when an interpreter was requested.[89] When an interpreter was provided, the plaintiffs testified they would sometimes have to wait "upwards of a full day" for the

---

[80] *See* Rodriguez depo. 72:23-73:6; (SEALED) Exhibit "A" at p. 62.
[81] *Id.* at 72:15-73:6; 109:6-20.
[82] Francois Declaration ¶¶ 9-10.
[83] *Id.* at ¶ 10.
[84] 624 Fed. Appx. 180 (5th Cir. 2015).
[85] 302 F.3d 567 (5th Cir. 2002).
[86] *Perez*, 624 Fed. Appx. at 182.
[87] *Id.*
[88] *Id.* at 185.
[89] *Id.*

interpreter to arrive.[90] The defendant occasionally attempted to use VRI to communicate with the plaintiffs, but plaintiffs presented evidence that the VRI did not always function properly.[91]

In *Delano-Pyle*, a police officer responded to a car accident and found the plaintiff, who communicated to the officer that he was severely hearing-impaired.[92]  The officer administered three sobriety tests to the plaintiff without inquiring about effective forms of communication.[93]  When the plaintiff failed these tests, the officer Mirandized him.[94]  The plaintiff was taken to the police station where his legal rights were again read to him, and the officer wrote Miranda warnings on a blackboard.[95]  Despite having full knowledge that the plaintiff was deaf, the officer proceeded to interrogate the plaintiff "without any accommodations to ensure that [the plaintiff] understood the circumstances of his arrest."[96]  The Fifth Circuit upheld a jury's verdict in favor of the plaintiff because the officer had knowledge of the plaintiff's impairment, admitted that he was unsure whether the plaintiff understood him both during the sobriety test or when he verbally communicated his legal rights but failed to provide any accommodation to assist the plaintiff in understanding what was happening.[97]

Plaintiff also relies on the decision by the Eleventh Circuit in *Silva v. Baptist Health South Florida, Inc.*, wherein the court stated that the ADA focuses on "the equal opportunity to participate in obtaining and utilizing services."[98]  Plaintiff cites the following

---

[90] *Id.* at 182.
[91] *Id.*
[92] *Delano-Pyle*, 302 F.3d at 570.
[93] *Id.*
[94] *Id.* at 571.
[95] *Id.*
[96] *Id.*
[97] *Id.* at 575-76.
[98] 856 F.3d 824, 834 (11th Cir. 2017).

Document Number: 60914

explanation by the *Silva* court as to the proper inquiry in a deaf-rights case brought against a healthcare provider:

> [L]imiting the required level of communication to that necessary to convey the primary symptoms, a treatment plan, and discharge instructions may still result in deaf patients receiving an unequal opportunity to participate in healthcare services in comparison to non-disabled patients. When a hearing (i.e., non-disabled) person goes to the hospital, that person is not limited only to describing symptoms and receiving the treatment plan and discharge instructions. The patient's conversation with the doctor could, and sometimes should, include a whole host of other topics, such as any prior medical conditions and history, medications the patient is taking, lifestyle and dietary habits, differential diagnoses, possible follow-up procedures and tests, informed-consent issues, and side effects and costs of potential courses of treatment. Because a non-disabled person has the benefit of this expansive informational exchange, it is error to conclude on summary judgment that the mere successful communication of the primary symptoms, treatment plan, and discharge instructions is enough, as a matter of law, to preclude liability under the ADA and RA.[99]

In light of the foregoing jurisprudence, Plaintiff maintains that a jury must evaluate whether he was provided an equal opportunity to communicate regarding his medical history and care in the same manner that such opportunity is available to hearing patients. Further, Plaintiff argues that there is a genuine issue of material fact as to whether OLOL committed intentional discrimination by choosing to not adequately accommodate his disability and failing to ensure that the communication with him was as effective as communications with others.

OLOL replies, attacking Plaintiff's offered evidence as immaterial to the question before the Court. OLOL contends that any dispute about the nature and extent of Plaintiff's understanding is not material because the issue is whether OLOL staff knew Plaintiff was not understanding the communications and deliberately chose not to

---

[99] *Id.* at 835.

accommodate him.  OLOL maintains that evidence probative of the Plaintiff's actual understanding rather than the state of mind of OLOL staff is immaterial.  Moreover, OLOL notes that Plaintiff testified that he never actually requested an interpreter during the relevant time period (April 11 -April 15), and the Fifth Circuit has held that the law "does not require clairvoyance;" rather; "the burden falls on the plaintiff 'to specifically identify the disability and resulting limitations,' and to request an accommodation in 'direct and specific' terms."[100]

OLOL claims that Deemer's testimony fails to carry Plaintiff's burden, as well. OLOL notes that Deemer could not identify to whom she made an interpreter request.[101] OLOL contends Deemer also admitted that she never actually requested an interpreter for Plaintiff; rather, she testified that she advised unknown OLOL staff that "he needed an interpreter."[102]  Even if Deemer made this request, it is well-settled in the law that simply because a patient requests a live interpreter does not mean the healthcare provider is always obliged to provide one.  OLOL cites the *Silva* decision, also relied upon by Plaintiff, wherein the Eleventh Circuit held that an on-site interpreter is not "necessary" in every situation to ensure effective communication:[103]

> That does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it. "The regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded." "[C]onstruing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid." If effective communication under the circumstances is achievable with something less than an on-site interpreter, then the hospital is well within its ADA and RA obligations to rely on other alternatives. Indeed, the implementing regulations clarify that "the ultimate decision as to what measures to take rests with" the hospital. And further, "[t]he type of auxiliary aid or service

---

[100] *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236–37 (5th Cir. 2017).
[101] Deemer Depo, p. 54:11–21.
[102] *Id.* at 64:17-20.
[103] *Silva*, 856 F.3d at 835.

necessary to ensure effective communication will vary in accordance with" several context-specific factors, including the "nature, length, and complexity of the communication involved; and the context in which the communication is taking place."[104]

Thus, OLOL argues that the fact that Plaintiff's grandmother may have requested an interpreter upon Plaintiff's admission is not evidence of deliberate indifference, as healthcare providers are not required to meet this particular request where there are other effective means of communication.   Further, OLOL maintains that the undisputed evidence in this case demonstrates that the OLOL nurses believed Plaintiff was communicating effectively using written methods and that he never indicated to the contrary.   Indeed, Deemer testified that Plaintiff was often given a pencil and paper to communicate with nurses, and he sometimes wrote responsive notes to those written to him by OLOL staff.[105]

As for Plaintiff's interaction with Deshotel, OLOL contends it remains undisputed that Deshotel spoke with Plaintiff in his native and preferred language when he met with Plaintiff the morning after his admission, and Plaintiff never requested an interpreter at any time to any staff member.    Further, this meeting occurred after Deemer allegedly requested an interpreter from unidentified OLOL staff.   Despite this, Plaintiff never asked for one, never indicated a need for one, and never indicated a lack of understanding.

OLOL contends that, notwithstanding Plaintiff's claim that he could not spell "interpreter," he could have very easily requested one during the meeting with Deshotel or asked a nurse to meet with Deshotel for this purpose. Plaintiff admitted he can write a question mark on a piece of paper to signify that he didn't understand, but he never did

---

[104] *Id.* at 835-836; *see also*, 28 C.F.R. §36.303(c)(1)(ii); *Martin v. Halifax Healthcare Sys., Inc.*, 621 Fed. Appx. 594, 601-602 (11th Cir. 2015).
[105] Deemer Depo., Rec. Doc. No. 134-8, p. 51:13-20.

so.[106]  He also admitted that he can type messages on his phone; yet he never typed out a message indicating he could not understand, that he needed an interpreter, that he wasn't communicating, or anything else to signify that communications were not effective.[107]

Importantly, argues OLOL, Plaintiff has failed to submit any summary judgment evidence to controvert the fact that OLOL staff members believed he was communicating effectively without an interpreter.  That Plaintiff now claims he did not understand these communications is not evidence that OLOL staff knew that he did not understand at the time and intentionally discriminated against him by failing to adjust his accommodations. Plaintiff's claim of deliberate indifference is undermined by the fact that, as soon as a lack of understanding was communicated to OLOL (by Rodriguez), an interpreter was immediately provided and continued to be provided on 61 separate occasions over the course of the following 29 days.[108]

As for Plaintiff's medical records, which Plaintiff contends are "replete" with notations that his communication was limited, OLOL notes that most of the citations actually reveal that the hospital was able to communicate with Plaintiff to assess his vitals and examine his condition.  Further, as to Plaintiff's reliance on Dr. Eischen's notes from meeting with Plaintiff and his family on April 16, 2017, OLOL maintains that this communication happened in the presence of an interpreter, and although it acknowledges that Plaintiff and his family expressed communication concerns on this date, it does not

---

[106] Francois Depo., 51:13-20.
[107] *Id.* at 20:4-22.
[108] Witter-Merithew Depo at 69:11-21.

establish that any OLOL staff members were aware of these concerns prior to Rodriguez's request for an interpreter.  OLOL avers that:

> The reality is that, as soon as OLOL was made aware that plaintiff was having difficulty communicating, interpreters were provided. Again, it is simply not enough for plaintiff to show that he did not understand his care—he must also show that OLOL was aware of that inability to understand and took no action. Because plaintiff has not provided any evidence to make such a showing, summary judgment is appropriate.[109]

## IV.   ANALYSIS

The Court finds that OLOL is entitled to summary judgment in this case.  Accepting Plaintiff's testimony as true, and interpreting all inferences in his favor, the Court finds that Plaintiff has failed to offer summary judgment evidence creating a genuine dispute of material fact in this case.

Plaintiff relies heavily on the testimony of his grandmother, Louise Deemer. However, a close review of her testimony does not carry Plaintiff's burden of coming forward with summary judgment evidence which shows that OLOL knew that Plaintiff was not understanding the communications. Deemer testified that she requested a sign language interpreter on Plaintiff's behalf when he was in the Emergency Room.  When asked if she recalled Plaintiff exchanging written messages with OLOL staff, Deemer recalled: "I remember there was a point when they would get the paper and pencil for him to write messages to them, and they write messages to him.  And I explained to them that he couldn't understand a lot of words you write, big words, he wasn't going to understand it.  A lot of words you write he wasn't going to understand it, period."[110]  However, she acknowledged that Plaintiff would "sometimes" write notes back to the nurses when they

---

[109] Rec. Doc. No. 144, p. 12.
[110] Deemer Depo at 51:6-12.
Document Number: 60914                                                                 20

wrote notes to Plaintiff.[111]  At one point during her deposition, Deemer acknowledged that that she was confusing some of her responses with care provided to Plaintiff by a different hospital on a different date.[112]

Deemer did testify that  "before he even got to the hospital," she asked "the driver of the ambulance … and the crew" for an interpreter, and upon arrival at the hospital, she advised "the lady at the desk" in the emergency room that Plaintiff "was speech and hearing impaired, and he needed an interpreter."[113]  Deemer also testified that she saw "the doctor" as they were taking Plaintiff into the emergency room, and she "told them he needs an interpreter."[114]

When asked if "there was ever a time at Our Lady of the Lake Hospital where you asked for any type of service and somebody told you 'no,'" Deemer responded "No, I ain't never asked for no type of service."[115]  Deemer further testified with respect to her alleged request for an interpreter:  "I didn't ask them for it. I let them know that he needed – he needed an interpreter …. They didn't say 'no,' but by the same token, they didn't provide one at that time."[116]  Deemer also testified that, on certain occasions where she attempted to explain notes from nurses to Plaintiff, she advised the nurses, "he is not understanding this."[117]

Viewing Deemer's testimony in a light most favorable to the Plaintiff, and accepting that Deemer requested an interpreter, the Court finds that, as a matter of law (discussed

---

[111] *Id.* at 51:18-20.
[112] *Id.* at 52:1-9.
[113] *Id.* at 53:2-11.
[114] *Id.* at 54:5-8.
[115] *Id.* at 64:9-13.
[116] *Id.* at 64:18-23.
[117] *Id.* at 77:12-14.

extensively above) a healthcare provider is not required to immediately provide an interpreter, even where one is requested, where the provider believes effective communication is taking place via other means.  Further, under the applicable jurisprudence, a hospital is not "more than deliberately indifferent" to a deaf patient's disability where the plaintiff appears to be understanding or is aided in understanding by loved ones.  Thus, to the extent Deemer or other family members received staff notes, advised that Plaintiff could not understand them, and then translated for Plaintiff in a manner he could understand, it is not intentional discrimination for OLOL staff to believe that this method constituted effective communication.[118]

In his *Opposition*, Plaintiff repeatedly refers to his meetings with Deshotel as "brief," however, this does not undermine the undisputed testimony that both Plaintiff and Deemer were present for this meeting, that Deshotel offered to accommodate Plaintiff in any way requested, and he advised Plaintiff that he could ask for him at any time if he needed anything.  Neither Deemer nor Plaintiff used this opportunity, while communicating in ASL, to request an interpreter, nor did Plaintiff request to speak to Deshotel over the next four days to advise that he was not communicating effectively.  It is notable that Deemer did not reiterate a request for an interpreter on Plaintiff's behalf during the Deshotel meeting. Further, even if Deshotel did not offer an interpreter during this meeting, that does not constitute discrimination.  The law requires that a plaintiff clearly request an accommodation; it is not to be assumed by the hospital.  It is also

---

[118] Specifically, Deemer testified about a nurse's note - that she believed Plaintiff did not understand – advised Plaintiff that he needed to be turned two or three times a day.  Yet, she indicated that Plaintiff knew he needed to be turned, "he just didn't want to be turned." Deemer Depo at 77:15-25.  Thus, Deemer inconsistently testifies that Plaintiff didn't understand that he needed to be turned, then immediately testifies that he understood that he needed to be turned, but simply did not want to be turned.

undisputed that Deshotel advised Plaintiff to ask for him at any time he felt he needed anything at all.  This does not constitute "something more than" deliberate indifference.

The expert testimony submitted by Plaintiff is unavailing to the issue at hand.  An expert's opinion that Plaintiff could not have understood OLOL's communications with him is not evidence that OLOL was aware that he was not understanding.

The Court disagrees with the Plaintiff's characterization that Plaintiff's medical records are "replete" with notes indicative of ineffective communication. A careful review of the summary judgment evidence does substantiate this argument.  Plaintiff cites to page 4 of the Plaintiff's *en globo* medical records,[119] wherein it is noted that "Student is deaf and uses sign language but no other family members sign.  Student cannot read, so communication is difficult."[120]  However, this note was entered "as of 4/18/2017," *after* OLOL was made aware of the communication deficiencies and two days *after* OLOL provided an interpreter to Plaintiff for the remainder of his hospitalization.  Plaintiff also cites to the following pages from his medical records as supporting evidence:  17, 21, 25, 42, 50, 54, 59, and 62.[121]  Pages 17, 21 and 25 are each dated 4/11/2017 at 8:43 PM, and each notes "Pt is deaf and mute so hx is limited."  These are duplicates, not separate chart entries, as Plaintiff seems to suggest, and while this chart note explains the reason for a limited patient history, the note is not evidence of knowledge that communication of healthcare information to the Plaintiff was ineffective.   Likewise, page 42, dated 4/13/2017 at 8:26 AM, notes "Pt deaf and mute, history is limited by communication." Page 50, dated 4/14/2017 at 7:28 AM, notes "Patient in bed communicating with dry erase

---

[119] (SEALED) Rec. Doc. No. 138.
[120] Rec. Doc. No. 138, p. 4.
[121] Rec. Doc. No. 134, p. 17 n. 56.
Document Number: 60914

board and sign language through family member at bedside.  History limited by communication."  This note demonstrates that, although Plaintiff's medical history is limited by communication, in the understanding of the Physician Assistant examining Plaintiff, he was effectively communicating by writing and family member translation. Page 54, dated 4/14/2017 at 9:12 AM, notes "pt mobility limited secondary to … communication barriers," but also notes:   "Upon completion of treatment, patient remained in bed in left sidelying with wedge with call bell in reach and all current needs addressed. Instructed grandmother and friend to move his feet and bend his knees for him throughout the day."  Page 59, dated 4/15/2017 at 4:46 PM, notes: "Patient in bed communicating with use of dry erase board as he is deaf and mute, history limited due to communication."  Finally, Page 62, dated 4/16/2017 at 11:38 AM, as noted by Dr. Eischen, states:

> Long discussion regarding patient's current care prognosis and discharge planning held in the presence of an interpreter.
>
> Patient's family and caregivers expressed concern that the patient was not understanding communication that had previously been provided. He was unclear about his diagnosis as well as his prognosis. He states that the interpreter television provided on the unit is extremely difficult to understand and he was unclear as to what was happening regarding his care.
>
> I explained to the patient his injury and his prognosis regarding his bilateral lower extremity paralysis secondary to his GSW. We discussed pain control as well as long-term plans. I informed him that he would likely require rehab and that would be determined based on PT/OT evaluations as well as input from case management. All questions were answered and the patient demonstrated understanding of his current condition and prognosis. I emphasized the importance of the patient expressing his concerns as well as his misunderstanding of information so that we can communicate more effectively.
>
> The family is requesting interpreter services be available at scheduled intervals in order for the patient to communicate his needs appropriately.

Time spent: 80 minutes in counseling with the patient, his family, and caregivers, as well as coordinating further care and communication.

Notably, not cited by Plaintiff, Page 29, dated 4/11/2017 at 10:06 PM, notes: "Pt is deaf and mute.  Hx was obtained by writing questions and interviewing grandmother." This note demonstrates that Plaintiff's medical history was effectively obtained via these methods of communication.  This medical record evidence shows that, although the hospital's ability to obtain a thorough medical history was limited by plaintiff's muteness, the barrier was overcome by "writing questions and interviewing grandmother." Furthermore, the chart notes are not evidence that the Plaintiff lacked understanding of the communications about his care and treatment that were directed to him. Finally, Plaintiff's reliance on Dr. Eischen's notes is misplaced. The Court finds that Dr. Eischen's notes undermine a claim of "more than deliberate indifference," as it acknowledges that, as of 4/16/17, OLOL was aware of prior communication deficiencies, and Dr. Eischen spent 80 minutes with Plaintiff and his family outlining steps to be taken to adequately accommodate Plaintiff's communication needs.  Importantly, this meeting took place in the presence of an interpreter, and it is dated after Rodriguez advised OLOL staff that Plaintiff was not understanding his treatment/prognosis and after she explicitly requested an interpreter.

In summary, Plaintiff was admitted on April 11, 2017 for emergent care due to a serious gunshot wound that ultimately left him paralyzed. Following admission, he immediately underwent emergency surgery. The next day on April 12, Plaintiff and his hearing grandmother met with OLOL Patient Care Coordinator, John Deshotel, who communicated with the Plaintiff in ASL. Neither Plaintiff nor his grandmother requested an ASL interpreter at the meeting with Deshotel. On April 14 and/or 15, Plaintiff's friend

and advocate requested an interpreter for Plaintiff. On April 16, at 11:38 a.m., Dr. Eischen met with the Plaintiff and his family for 80 minutes, and with the aid of an interpreter, "explained to the patient his injury and his prognosis." From that point on, for the 29-day remaining duration of the Plaintiff's in-patient care, the hospital provided an interpreter.

Applying the applicable legal standards to the undisputed facts established in this case, the Court finds that Plaintiff has failed to present sufficient summary judgment evidence from which a reasonable finder of fact could conclude that any conduct on the part of OLOL staff was "something more than" deliberately indifferent to Plaintiff's disability. Plaintiff has failed to present evidence that OLOL staff had actual notice that Plaintiff's rights were being violated. Further, notwithstanding Plaintiff's actual understanding at the time, the uncontroverted record demonstrates that OLOL staff made good faith efforts to accommodate Plaintiff and believed that communication via written messages and family assistance was effective, especially considering Plaintiff never indicated a lack of understanding or requested an interpreter or to meet with Deshotel. While the evidence may demonstrate negligence or carelessness on the part of OLOL staff, as discussed in *Rosario*, there is no summary evidence before the Court that OLOL made a "deliberate" or "purposeful" choice to intentionally discriminate against the Plaintiff because of his disability.

The Court sees little resemblance in the facts of this case to those in *Perez* and *Delano-Pyle*. Rather, the Court finds the following cases, wherein other district courts have granted summary judgment, to be more analogous to the facts presented herein.

In *Rosario*, mentioned *supra*, the district court for the Eastern District of Louisiana determined that a hospital was not deliberately indifferent to a deaf plaintiff for failing to

provide a live interpreter.  The deaf and mute plaintiff, who was 32 weeks pregnant, was

sent to the emergency room after presenting at a routine check-up with very high blood

pressure.[122]  When the plaintiff arrived at the ER, she gave a written note to hospital staff

requesting an interpreter.[123] Consistent with hospital policy, the treating nurse provided

the plaintiff with an iPad to communicate with the plaintiff through VRI.[124]  However, the

VRI communications did not go smoothly:  it would often disconnect from the WiFi; the

picture would freeze or become pixelated; or the picture would disappear altogether.[125]

This was the first time the plaintiff had ever used VRI to communicate.[126]  The plaintiff's

partner and father of her children accompanied the plaintiff and witnessed the technical

difficulties with the VRI that caused the plaintiff to become mad and frustrated owing to

her inability to understand.[127]  Following this interaction, the plaintiff again requested a

live interpreter and allegedly provided the nurse with the name of an interpreter the

plaintiff had previously used.  Although the nurse disputed this, she claimed that she left

the room and called for ASL interpreter services but was ultimately unsuccessful in

obtaining someone.[128]  The nurse apologized to the plaintiff, advised that a live interpreter

was unavailable, and continued to communicate with the plaintiff via VRI.[129]

     The plaintiff subsequently had an ultrasound and was given discharge instructions,

all via VRI, which occasionally worked.[130]  Although the VRI worked during the discharge

instructions, the plaintiff maintained that she did not understand the big words being used

---

[122] 2019 WL 1766983 at *1.
[123] *Id.*
[124] *Id.* at *2.
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.* at *3.
[129] *Id.*
[130] *Id.*

or what medications she should take.[131]  When the plaintiff returned home, she was not compliant with medications because she did not fully understand the accompanying instructions.[132]  Although the plaintiff later delivered a healthy baby with the assistance of a live interpreter, she filed suit against the hospital for the ER incident, claiming her rights under the ADA, RA, and ACA were violated in that the hospital discriminated against her on the basis of her disability by refusing to provide her with auxiliary aids and services necessary to ensure effective communication.[133]  The hospital moved for summary judgment.

The *Rosario* court found that the plaintiff had failed to present evidence of intentional discrimination:  "Even when applying the deliberate indifference standard of intent—which the Fifth Circuit has indicated is a lower threshold than the standard that governs this Court, *Miraglia*, 901 F.3d at 575—the facts plaintiff has presented are insufficient to preclude summary judgment."[134]  The court rejected the argument that the hospital was required to provide a live interpreter on demand:  "Defendant's initial unwillingness to secure an on-site interpreter, and Reitz's initial reliance on the VRI and written communication, is not alone evidence of deliberate indifference."[135] Noting that applicable "[r]egulations promulgated to implement the ADA's provisions state that appropriate auxiliary aids and services for the hearing impaired include '[q]ualified interpreters on-site or through video remote interpreting (VRI) services,'"[136] the court

---

[131] *Id.*

[132] *Id.*

[133] *Id.* at *4.

[134] *Id.* at *6.

[135] *Id.* at *7 (citing *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015) ("[A] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." (citing *McCullum*, 768 F.3d at 1147))).

[136] *Id.* (quoting 28 C.F.R. §§ 35.104(1), 35.160(b)(1)).

determined that the nurse's "initial use of the VRI and written communication instead of securing an on-site interpreter was also consistent with defendant's policies."[137]    The court continued:

> When the VRI began to malfunction, plaintiff became visibly frustrated by the quality of the VRI and reiterated her request for an on-site interpreter. Reitz did not ignore plaintiff's request. Indeed, plaintiff does not dispute that Reitz left the room and called the Northshore DAC. The hospital's phone records confirm that Reitz placed this call. Reitz testified that a representative from the Northshore DAC told her that no one was available to come to the hospital on such short notice. Plaintiff has not presented any facts that dispute Reitz's testimony about this phone call.[138]

The court concluded that, since the nurse attempted to contact a live interpreter, "[i]t was at worst negligent or careless of Reitz not to call the second organization listed," and "[n]egligence is not evidence of deliberate indifference or intentional discrimination."[139]

Important in the *Rosario* court's analysis was the serious nature of the plaintiff's medical condition when she presented to the ER. The court reasoned:

> Making additional calls to ASL service providers, after she had been informed by one organization that an interpreter was not available on such short notice, would have delayed plaintiff's treatment in an emergency situation. Thus, even when drawing all inferences in plaintiff's favor, Reitz's decision to not make these additional calls was a reasonable decision under the circumstances. Her behavior is certainly not evidence of intentional discrimination.[140]

---

[137] *Id.*

[138] *Id.*

[139] *Id.* at *8 (citing *Saltzman v. Bd. of Comm'rs of N. Broward Hosp. Dist.*, 239 F. App'x 484, 488 (11th Cir. 2007))(noting that although the hospital staff's attempt to secure an on-site interpreter "may have been negligently made, negligence is not intentional discrimination"); *see also Jacobs v. W. Feliciana Sheriff's Dept.*, 228 F.3d 388 (5th Cir. 2000) (in the context of a Section 1983 claim, noting that deputy sheriff's "failure to abide by" certain policies "evinces at best[ ] negligence ... which is insufficient to support a finding of deliberate indifference")).

[140] *Id.*

The court also rejected the plaintiff's claims of discrimination regarding her discharge instructions.  Although the plaintiff later testified that she did not understand the VRI interpreter based on the big words being used during discharge instructions, the court found that there was "no indication in the record that plaintiff made it known" to the nurse that she was unable to understand the VRI communications.[141]  The court stated:

> Before intent can be imputed on a defendant, the defendant "must have notice of a violation." *Miraglia*, 901 F.3d at 575 (defendant did not intentionally discriminate by not providing adequate wheelchair-accessible ramps at its entrance when there was no evidence the defendant had notice the ramps were not ADA-compliant). Because there is no evidence that plaintiff notified anyone at discharge that the accommodation the hospital provided her was ineffective, no reasonable juror could find that Reitz intentionally discriminated against plaintiff at discharge. *Id.*; *McCullum*, 768 F.3d at 1148 (no finding of deliberate indifference when there was "no evidence to support a conclusion that [defendant's] staff knew that their accommodations were ineffective").[142]

Like the present Plaintiff, the *Rosario* plaintiff also likened the facts of her case to those in *Perez* and *Delano-Pyle*.  The court easily distinguished these cases from the plaintiff's:

> Unlike *Perez*, this is not a case where a defendant's repeated failure to properly accommodate the plaintiff over an extended period of time allows for an inference of intentional discrimination. Rather, plaintiff's case is limited to her experience on one emergency visit that lasted approximately three hours. During that emergency visit, the hospital first provided plaintiff with an interpreter through VRI, and then attempted to secure an on-site interpreter when the nurse was notified that the VRI was malfunctioning. Plaintiff admits that she was able to effectively communicate with defendant's staff during her subsequent visit. *Perez* is thus entirely inapposite.
>
> * * *
>
> Unlike the officer in *Delano-Pyle*, defendant did attempt to accommodate plaintiff's disability. Reitz first provided plaintiff with an interpreter through VRI, and then attempted to secure an on-site interpreter when the VRI malfunctioned. As already addressed, that the VRI initially malfunctioned,

---

[141] *Id.*
[142] *Id.*
Document Number: 60914

and that Reitz was—at worst—negligent in attempting to secure an on-site interpreter, is not enough to support an inference that Reitz was deliberately indifferent to plaintiff's needs. This is especially true considering the nature of plaintiff's emergency visit to the hospital. Because the evidence before the Court is not even enough to show that defendant was deliberately indifferent, it is not enough to establish intentional discrimination in the Fifth Circuit. *Miraglia*, 901 F.3d at 575 (noting that the Fifth Circuit has previously required "something more than 'deliberate indifference' to show intent").

The same analysis distinguishing Rosario's case from *Perez* and *Delano-Pyle* is equally applicable in the present case.

Accordingly, the Court shall grant summary judgment and dismiss the Plaintiff's RA and ACA claims.

### D.  Entitlement to Injunctive Relief

Plaintiff has also moved for injunctive relief, requesting that the Court order OLOL to implement various relief measures, including, *inter alia*, developing and implementing policies prohibiting future discrimination against deaf individuals, prohibiting the denial to deaf individuals their right to effective communication; requiring OLOL to provide ASL interpreters when requested; and posting proper notices of deaf patients' rights.[143]  OLOL moves for summary judgment on Plaintiff's claim for injunctive relief.

To establish Article III standing, a plaintiff must show: (1) an injury in fact that is concrete, particularized, and imminent, and is not conjectural or hypothetical; (2) a causal connection demonstrating that the injury is fairly traceable to the defendant's challenged actions; and (3) that it is likely—not simply speculative—that a favorable decision will redress the injury.[144]  The Fifth Circuit has explained that "a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that

---

[143] Rec. Doc. No. 1, pp. 18-19.
[144] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted).
Document Number: 60914

[the alleged barrier] actually affects his activities in some concrete way."[145]  Because the Court has found no injury in fact, Plaintiff is not entitled to injunctive relief.

### E.  Purported Contract Claims

Plaintiff argues that he may pursue damages for bodily Injury and pain and suffering, and damages for denial of self-determination under the RA and ACA via the Restatement (Second) of Contracts and Louisiana contract law.  OLOL counters that Plaintiff has not pled a claim for battery or any other physical injury in the *Complaint* or *Amended Complaint*, nor has he pled any physical pain whatsoever.  Thus, Plaintiff cannot now seek to recover for such a cause of action.  "[I]t is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss."[146]  Because these claims are not properly alleged in this matter, the Court need not consider them as such for purposes of this *Ruling*.

---

[145] *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011).
[146] *Becnel v. St. Charles Par. Sheriff's Office*, No. 15-1011, 2015 WL 5665060, at *1 n.3 (E.D. La. Sept. 24, 2015) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011) (collecting cases)). Because a Rule 12(b)(6) motion tasks the Court with "assess[ing] the legal sufficiency of the complaint," a court should not consider allegations that appear for the first time in plaintiffs' briefing. *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 806 (5th Cir. 2012).

## V.    CONCLUSION

For the reasons set forth above, OLOL's *Motion for Summary Judgment*[147] is GRANTED. Plaintiff's claims are dismissed with prejudice.  All pending *Motions in Limine* are hereby DENIED as MOOT.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this October 14, 2020.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[147] Rec. Doc. No. 118.
Document Number: 60914